FILED
CLERK

3/8/2022 3:13 pm

U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------X
                              :
DAVID LEACRAFT,               :
                              :   21-CV-5688 (GRB)(AYS)
              Plaintiff,      :
                              :   February 22, 2022
                              :
         V.                   :   Central Islip, NY
                              :
CANON USA, INC.,              :
                              :
              Defendant.      :
------------------------------X


   TRANSCRIPT OF CIVIL CAUSE FOR PRE-MOTION CONFERENCE
        BEFORE THE HONORABLE GARY R. BROWN
           UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiff:            COURTNEY MACCARONE, ESQ.
                              MARK REICH, ESQ.
                              Levi & Korsinsky LLP
                              55 Broadway, 10th Floor
                              New York, NY 10006


For the Defendant:            RICHARD SILBERBERG, ESQ.
                              ANTHONY BADARACCO, ESQ.
                              Dorsey & Whitney, LLP
                              250 Park Avenue
                              New York, NY 10177


Court Transcriber:            ARIA SERVICES, INC.
                              c/o Elizabeth Barron
                              274 Hovey Road
                              Milo, ME 04463
                              Aria@leinen.net


Proceedings recorded by electronic sound recording,
transcript produced by transcription service

1                    THE CLERK:  Calling case 21-CV-5688,

2        Leacraft v. Canon USA, Incorporated.

3                    Counsel, please state your appearance for

4        the record.

5                    THE COURT:  Plaintiff first, please,

6        plaintiff first.

7                    MS. MACCARONE:  Good afternoon, this is

8        Courtney Maccarone from Levi & Korsinsky on behalf of

9        the plaintiff.  And also on the line is Mark Reich from

10       my office, appearing on behalf of the plaintiff.

11                   MR. SILBERBERG:  Good afternoon, your Honor.

12       My name is Richard Silberberg of Dorsey & Whitney, LLP

13       for the defendant Canon USA.  With me is my partner,

14       Anthony Badaracco.

15                   THE COURT:  This is Judge Brown.  We are

16       here for a pre-motion conference.  Because of the

17       pandemic, we're doing this by audio conference, which

18       should suffice for today's purposes.  Please

19       understand, as you've been advised before in my local

20       rules, anyone can make any motion they want, but I

21       reserve the right to deem the motion made based on the

22       filings of counsel as well as the arguments you make

23       today, so make any argument you want because I'll hear

24       you on anything you want to say.

25                   Let me go to defense counsel.  I believe

1   it's your motion to dismiss that's at issue, so why

2   don't you go ahead and take the lead.

3          MR. SILBERBERG:  Very good, your Honor, good

4   afternoon.  The situation here is that we have a

5   printer -- it's called a multifunction printer because

6   it performs multiple functions.

7          THE COURT:  Let me just be clear on that.

8   It can print, it can fax, it can scan, yes?

9          MR. SILBERBERG:  Actually not.  The

10  plaintiff's printer is a three-function device so it

11  can print, copy, and scan.

12         THE COURT:  Okay.

13         MR. SILBERBERG:  There are other models on

14  the market produced by our client that can perform four

15  functions.  The fourth function would be fax.

16         THE COURT:  Got it.

17         MR. SILBERBERG:  But this particular

18  plaintiff with this particular unit has a three-

19  function device.

20         THE COURT:  Okay.

21         MR. SILBERBERG:  The issue here is the

22  scanning function.

23         THE COURT:  Right.

24         MR. SILBERBERG:  On the box that the printer

25  comes in, it says it can print, copy, and scan.  It

1  does scan.  The plaintiff takes the position that that

2  is a breach of express warranty and that it's also --

3          THE COURT:  Hold on, hold on.  They don't

4  take the position that that is a breach of the express

5  warranty.  The position they take is that it won't scan

6  when it's out of ink and that's the breach, yes?

7          MR. SILBERBERG:  Well, there is no such

8  warranty.  That's our position.

9          THE COURT:  I understand, I understand, but

10  their -- their right, we'll call it, irrespective of

11  the claim -- we'll talk about the legal claim in a

12  moment -- is that the machine won't scan, and I'll add

13  unless you do certain things when it's out of ink.

14          MR. SILBERBERG:  Correct.

15          THE COURT:  Is that a fair summary of the

16  allegations, yeah?

17          MR. SILBERBERG:  It is.

18          THE COURT:  Okay.  I'm kind of with you on

19  the express warranty.  I'm going to go to defendant's

20  counsel -- I'm sorry, plaintiff's counsel in a second

21  and you can say anything you want to me, but I doubt

22  that the express warranty anywhere says, hey, when

23  you're out of ink, the scanning function works just

24  great.  It probably doesn't make any such

25  representation.  That's going to be your argument to

1  me, is that fair?

2          MR. SILBERBERG:  Correct.

3          THE COURT:  Okay.  On that limited piece,

4  let's just start with the express warranty.  Where in

5  the express warranty does it make a representation

6  that's covered by this?

7          MR. SILBERBERG:  I assume that's a question

8  for the plaintiff, your Honor?

9          THE COURT:  Yeah, let's go to plaintiff's

10  counsel on that, please.

11          MS. MACCARONE:  Thank you, your Honor.  The

12  express warranty that the product scans appears on the

13  box of the device that was purchased by the plaintiff.

14  The box states that the device scans.

15          THE COURT:  Is there a formal either printed

16  or (ui) or online express warranty that comes with this

17  product?

18          MS. MACCARONE:  The express warranty claim

19  relates to the advertising that appears on the product

20  label and also, Canon's website, there are express

21  warrantees that the device does scan.  Nowhere on the

22  website or on the box does Canon state that there are

23  certain requirements that must be met in order for the

24  product to function in that capacity.

25          THE COURT:  Listen, so this is a weird one

1   I'm going to throw at you because I recognize -- motion

2   to dismiss, 12(b)(6), you're supposed to look only at

3   the complaint, you didn't say this in the complaint.

4   But the defendants have raised this argument that if

5   you hold certain buttons a certain amount of time, it

6   will in fact scan.  Do you agree with that as a factual

7   matter?

8           MS. MACCARONE:  No, your Honor.  Our client

9   tried this fix and it did not in fact work for him.

10          THE COURT:  That's interesting.  That's

11  interesting.

12          MR. SILBERBERG:  Your Honor, this is Rich

13  Silberberg, if I could just weigh in on that point.

14          THE COURT:  Yes.  The holding the button

15  thing, Mr. Silberberg -- the holding the button thing

16  sounds like it's a screaming question for summary

17  judgment, right?  I don't know that I can deal with

18  that right now.

19          MR. SILBERBERG:  Yeah, and we're not asking

20  you to because --

21          THE COURT:  Okay.

22          MR. SILBERBERG:  We recognize that if they

23  say it doesn't work as a matter of fact, it's hard for

24  us to convince you to dismiss that allegation on a

25  motion to dismiss.

1          THE COURT:  Right.

2          MR. SILBERBERG:  However, I'm representing

3    to the Court that it is 100% clear that this equipment

4    does scan without ink in the ink cartridges.  All you

5    have to do is to press what's called the stop button

6    for five seconds and then you can scan without there

7    being any ink in the ink cartridges.

8          THE COURT:  Is that in the literature

9    somewhere that's accessible with the product?

10          MR. SILBERBERG:  It's on our website.  Yes,

11    it's on our website.  There is an article that is

12    devoted specifically to this.  All you need to do is go

13    to the website and type in a search "scan without ink"

14    or something of that kind, and it will pop up and tell

15    you exactly what to do.

16          THE COURT:  Okay, interesting.

17          MS. MACCARONE:  Your Honor?

18          THE COURT:  Go ahead.

19          MS. MACCARONE:  Thank you, your Honor.

20    Defendant is making this process seem like it's a lot

21    easier than it actually is.  In order to find this

22    article that defendant is referring to, you have to go

23    through multiple steps on Canon's website in order to

24    finally reach the appropriate search bar that defense

25    counsel is referring to, and then type in a combination

1    of words that will pull up multiple articles.  And if

2    you pick the correct combination of words, one of those

3    results may be this article about how to print with a

4    print-error message, an ink-error message.

5              THE COURT:  I hear you, counsel, but it's a

6    weird thing.  I'm trying to sort of suss out the claims

7    in my mind.  The express warranty claim is a very

8    formal thing, right?  It requires many sort of

9    predicates.  You say the scanner on the box -- say I

10   bought a car, right, and it ran out of gasoline and now

11   it doesn't run, so it's not a car anymore.  I'm not

12   sure that works for an express warranty claim.  I'm not

13   talking about your DBL claims, which are a completely

14   different story, but I'm having a hard time imagining

15   why this should proceed on an express warranty theory.

16   Maybe you can help me with that.

17             MS. MACCARONE:  Canon largely bases its

18   argument for the express warranty claim on what the

19   word "scan" means and that it would be extraordinary

20   for a purchasers to leave empty ink cartridges in the

21   printer and then attempt to use the machine solely to

22   scan.  Whether a reasonable consumer would interpret

23   the word "scan" to mean that the device will scan when

24   there is no ink or whether a consumer would try to scan

25   when the ink is low are issues of fact that are just

1    not appropriate at this stage.

2            THE COURT:  I agree and by the way, I do not

3    find -- I'll say this to everybody because I like to

4    reveal any sort of thoughts I've had, which is I don't

5    find that it's unreasonable for someone to want to use

6    the scanner when they're out of ink.  In fact, I find

7    it more likely than when you're out of ink, you might

8    say, I'd better scan that document and at least I can

9    email it to somebody if I can't print a copy today and

10   mail it or something.  I can't find that categorically,

11   as a matter of logic, I can exclude that use.

12           But I still don't see how that gets -- I

13   don't see how that bears on the express warranty.  I'm

14   just not seeing a portion of the express warranty as

15   set forth here that could potentially -- that it's

16   plausible that that's violating the express warranty,

17   that certain buttons have to be pushed or it has to be

18   -- or even in the ink is in place.  I'm not sure that

19   -- I'm having a hard time with that.  I don't know, we

20   can go back to it.

21           Let me ask defense counsel to continue.  Why

22   don't you go on to the rest of the motion and we'll

23   come back to that, all right?

24           MR. SILBERBERG:  Okay, thank you, your

25   Honor.  What I'd like to address now is the issue of

1   the GLB 349 and 350 claims.  The real issue here is the

2   following:  The plaintiff says, as counsel has just

3   indicated, that your Honor cannot make this

4   determination at this stage of the case, that your

5   Honor cannot determine whether a piece of advertising

6   was materially misleading at the motion to dismiss

7   stage, so that's what I would like to address firstly.

8   Your Honor actually wrote about this very issue earlier

9   this year in the Schulder (ph) case.

10              THE COURT:  Okay.

11              MR. SILBERBERG:  And your Honor recognized

12  that there is -- there are cases on both sides of this

13  equation.  There are cases which establish that the

14  nature of the advertising does not permit a motion to

15  be granted at the motion to dismiss stage.  However,

16  your Honor also stated that there are other cases and

17  in particular, you cited the Second Circuit's decision

18  in Fink v. Time Warner Cable, that where the court can

19  make a determination as to whether or not a particular

20  piece of advertising is materially misleading at the

21  motion to dismiss stage.

22              The way that we look at this prospective

23  motion is that we believe through briefing, that we can

24  establish to your satisfaction that as a matter of law,

25  it is not materially misleading to say that this

1    product scans, because that's all we've said.  That's

2    all the advertisement says, that it scans.

3              THE COURT:  Let me back up for a second.

4    Hold on, counsel, for one second.

5              MR. SILBERBERG:  Yes.

6              THE COURT:  You mentioned the Schulder case.

7    Forgive me because I've written a lot this year.  We've

8    been very busy.  What was the product there because

9    seriously, I've done a bunch of cases this year.

10             MR. SILBERBERG:  It was a food -- Tony, do

11   you have that?  It was a food case as I recall.

12             THE COURT:  I think it was honey.  I think

13   the honey (ui).

14             MR. SILBERBERG:  That's right.

15             THE COURT:  Okay, I remember that.

16             MR. SILBERBERG:  That's exactly right.

17             THE COURT:  Okay, because I remember stories

18   and I remember case names.  So that's really

19   interesting.  I let that one go forward because I said,

20   look, I don't really know what the purchaser was

21   thinking when they bought natural honey.  Did that mean

22   that it didn't have some trace elements of pesticides

23   in it or whatever because bees are dirty.  They come

24   back with the stuff and they contaminate it, and they

25   can't control it.  It's really interesting.

1          But in this one, I don't know that I feel

2    the same way.  Can I categorically say that there

3    aren't purchasers who purchased this product because it

4    had multiple functions, and maybe they didn't care so

5    much about printing.  I'm a 20th century guy and I like

6    paper, so I care about my printer a great deal.  But

7    there are probably sort of millennials who will say,

8    I'm never going to use the printer but it's a great

9    scanner, you know, and if I needed a copy, I would use

10   it for a copy or something.  I have a hard time

11   categorically -- no, they don't care about this

12   interrelation between the things.

13          MR. SILBERBERG:  So let me address that this

14   way:  We think, and we'd like the opportunity to

15   convince you that to use the scanner -- I'm sorry, to

16   use the device solely as a scanner once it has been

17   depleted of ink such that you cannot use either the

18   printer function or the copy function --

19          THE COURT:  Right.

20          MR. SILBERBERG:  -- is so unusual that it's

21   an idiosyncratic choice of a consumer.  And the Oswego

22   (ph) case, a New York Court of Appeals case, states

23   very clearly that a company is not required to suss out

24   the idiosyncratic choices of consumers, that at some

25   point, a judgment needs to be made as to whether this

1    is materially misleading with regard to whether there

2    was some millennial out there who would buy a

3    multifunction device, only use it until the first

4    cartridge runs out of ink, and then only use it

5    thereafter for scanning.

6              THE COURT:  All right, let's stay with this

7    because now you're talking about the GBL 349 and 350

8    claims, correct?

9              MR. SILBERBERG:  Yes.

10             THE COURT:  Okay.  So I've had a fair number

11   of those over the years and I find it to be an

12   extraordinarily flexible statute, right, anything that

13   could be used to mislead consumers, improper practices.

14   There are a lot of elements to that.  Let's imagine --

15   and I know this won't happen but as plunge into

16   discovery if we plunge into discovery, there's a memo

17   out there where some engineer says, I've got a great

18   idea, let's make sure that the scanner function shuts

19   out when they run out of ink because this way, we'll

20   sell a lot more ink.  There's a Power Point at a

21   meeting and they say, yeah, that's a great idea.

22   Wouldn't that -- I mean, this is -- you sort of have me

23   more interested on the express warranty thing but

24   doesn't that fall into the kind of conduct that might

25   be addressed under a 349 claim?

1              MR. SILBERBERG:  First of all, there is no

2      such memo.  Second of all --

3              THE COURT:  The issue is complicated (ui).

4              MR. SILBERBERG:  I understand.  Second of

5      all, these printers, your Honor, have been on the

6      market since I want to say -- I'm trying to remember

7      exactly.  2004 I believe is when this series of

8      printers was released.  So you would think that we

9      would be getting lots of complaints if in fact this was

10     something that was deemed to be materially misleading,

11     but let me address the specific scenario that your

12     Honor just mentioned.

13              THE COURT:  Right.

14              MR. SILBERBERG:  And that is, if the goal

15     was to sell more ink, it would be a really, really bad

16     way to do it because the machine does in fact scan

17     without ink.  It does.  So the notion -- the notion

18     that we would have done this in order to create a

19     situation where we're going to sell a lot more ink

20     doesn't work.

21              THE COURT:  Counsel, I hear you.

22     Understand, I'm in a situation where it's the four

23     corners of the complaint now, right?  So I hear you, I

24     credit you.  I realize that that's probably going to be

25     the case, that there are other steps, although it's an

1    interesting question.  Even if you said -- my evil memo

2    that I concocted a moment ago -- that's the problem

3    with me teaching law school at night.  I think of

4    hypotheticals all the time.  He gets this memo and he

5    says, I've got an idea.  We can't shut off the scanner

6    altogether but let's make it really hard to use the

7    scanner unless you've got some ink.  Again, it strikes

8    me as sort of a classic 349/350 case if that were the

9    motivation.  Again, you're going to tell me it's not

10   and discovery --

11            MR. SILBERBERG:  Well, it's not and there

12   are no facts alleged in the complaint -- sorry to

13   interrupt, Judge.

14            THE COURT:  No, no.

15            MR. SILBERBERG:  There are no facts alleged

16   in the complaint to establish that.  It's just a bare

17   legal conclusion.

18            THE COURT:  But the facts that are alleged

19   in the complaint -- actually, I have to accept that

20   it's true that the scanner doesn't work if there's no

21   ink in the machine.  You tell me there's another

22   procedure but that's not there, right?  It's not in the

23   complaint so I don't really even have that in front of

24   me.  But even if I had that in front of me, what I'm

25   saying to you is that I don't know that I don't have to

1  let that flesh out a little bit in terms of discovery

2  and inquiry to see where that came from, does it matter

3  to consumers and whatnot.  It seems to me odd to sort

4  of odd to say, well, I can conclude at this point that

5  that didn't matter to anybody, it's fine.

6       MR. SILBERBERG:  Well, that would also have

7  to -- you would also have to assume that -- when a

8  consumer is looking at the box and deciding whether to

9  purchase the unit, you would have to assume that that

10  consumer believes that they can scan without ink.

11  That's putting something in the -- where are the facts

12  in the complaint to establish that?

13       THE COURT:  I mean, there's nothing in the

14  complaint that says the box says, by the way, make sure

15  you always have ink on hand because otherwise, the

16  scanner is going out or it will be much harder to use.

17  That's not there, either, so I don't know what the

18  answer is.

19       MR. SILBERBERG:  Let me give you another --

20  let me give you another complication, another

21  illustration.

22       THE COURT:  I'm all ears.

23       MR. SILBERBERG:  Which I think will make the

24  situation even more clear from my perspective.  Let's

25  take the facsimile function because they also claim it

1  can't fax without it.  Actually, it can.

2           THE COURT:  I thought you said these don't

3  fax at all.

4           MR. SILBERBERG:  They're talking about other

5  units.  They're talking about models (ui).

6           THE COURT:  Okay.

7           MR. SILBERBERG:  Other in the series.  It's

8  called Pix (ph), the series.  So let's take the

9  facsimile illustration.  They say it also can't fax

10 without ink and we of course say it can through the

11 same process.  Let's consider the following:  You

12 actually do need ink in order to perform certain of the

13 facsimile function.  What you can do is you can go to a

14 machine, you can put it into the fax tray, and you can

15 send a fax.  However, if the person receiving the fax

16 has no ink, that person is not going to receive that

17 fax because there's no ink to print it, in addition to

18 which the sender sending that fax, if that sender has

19 no ink, that sender is not going to be able to print a

20 receipt showing that that fax was transmitted.

21           THE COURT:  Yeah.

22           MR. SILBERBERG:  By the way, this is their

23 complaint.  They do say that you can't fax.  I mean, at

24 some point, you get to the position of ridiculousness,

25 and we think that's where we are.  There is absolutely

1   no basis for saying that this can't scan without it and

2   there are no facts in this complaint that establish

3   that ordinary circumstances are those in which a

4   consumer would as a regular matter try to scan without

5   any ink.

6           The last thing I'd like to say about this

7   particular point, Judge, is let's assume that my

8   representation to you is correct, that this can scan

9   without ink.  You just mentioned opening this up to

10  discovery.  What would that look like?  I mean, imagine

11  what the expense would be.  They are talking about a

12  series of dozens of models that they want to bring

13  under the umbrella of this case.  And if my

14  representation to you is correct that these can scan

15  without ink, is it really fair to open up to full

16  discovery a case to show what, that it can scan without

17  ink?

18          THE COURT:  Counsel, it's really, as you

19  well know and your client who is a big company, they

20  know that interesting is bad, right, because it causes

21  a lot of money and we argue a long time, but it's

22  really interesting.  But let me hear your adversary on

23  the GBL claims.

24          MS. MACCARONE:  I would like to address some

25  of the points that defense counsel made in turn.

1   First, the argument about it being so unusual for a

2   person to want to scan a document without ink in their

3   printer, that is certainly not the case.  Just based on

4   our client's experience, it's an experience that -- we

5   talked to other consumers who have experienced this

6   same issue.  Just in, you know, my personal experience,

7   there are certainly situations in which people would

8   want to use their device in order to scan documents

9   when there is no ink in the device.

10          THE COURT:  Clearly, you had me at hello on

11  this one, right, because I said to you earlier that it

12  might be --

13          MS. MACCARONE:  Okay.

14          THE COURT:  -- that it's more critical that

15  you have a scanner.  Oh, gosh, I can't print it, let me

16  just scan it and email it.  I'm going to email it to my

17  office, where I'll print it, right?  I hear you so you

18  can go ahead.

19          MS. MACCARONE:  Absolutely, okay.  All

20  right, great.  Also, to the argument about if -- that

21  the devices were released in 2004 and if this were an

22  actual issue, there would have been more complaints.

23  The internet is replete with complaints about this

24  issue.  And to defense counsel's point about, if they

25  wanted to sell more ink, then this is not the way to do

1   it, then why not just include a disclosure on the

2   product label about this?  It does seem that ink sales

3   are at the bottom of this decision from Canon's

4   perspective.

5           THE COURT:  All right, good.  I think I have

6   what I need.

7           MR. SILBERBERG:  Your Honor, can I make one

8   other -- one other point?

9           THE COURT:  You can, then shift gears and go

10  to the unjust enrichment claim.

11          MR. SILBERBERG:  Yes, of course.  I wanted

12  to point out that we do cite a case in our pre-motion

13  conference letter, which I think is very instructive.

14  It's the (ui) case and that case is as close to this

15  case as can be.  It's a case that was decided by the

16  Second Department in 2002.  It involved a case against

17  Hewlett Packard involving these printers, same type of

18  printers.  And the issue in that case was that the

19  printer box showed that there were cartridges packed in

20  the box and in fact, that was true.  You open up the

21  printer, you take out the cartridges, you put the

22  cartridges in the machine, and it prints.  However, the

23  cartridges were not the standard-sized cartridge that

24  you would buy at Staples.

25          THE COURT:  Yeah, those are the ones --

1              MR. SILBERBERG:  They're what we call --

2              THE COURT:  (Ui).

3              MR. SILBERBERG:  Sorry?

4              THE COURT:  I'm familiar with them, yes.

5    They're sample-size cartridges more or less, yes?

6              MR. SILBERBERG:  Right, they're sometimes

7    called starter cartridges.

8              THE COURT:  Right.

9              MR. SILBERBERG:  So the plaintiff alleged

10   and brought an action under 349 and 350 as well as I

11   think a breach of express warranty claim.  I'm not sure

12   about that but certainly 349 and 350, and said this is

13   materially misleading.  You said there were cartridges

14   in there.  I assumed that these are the cartridges

15   which I'm going to get when I go to the store and that

16   they will last me a while.  Then they find, to their

17   concern, that they don't last very long, that they're

18   starter cartridges.

19              The court held as a matter of law that this

20   is not materially misleading.  It says on the box,

21   there are cartridges in this box and these cartridges

22   work with this printer.  We say, this machine scans,

23   and it does.  And whether you're going to engraft on to

24   that representation or that advertising the issue of

25   whether or not it scans in the presence of ink or

1   without ink, that seems to us not to be a proper

2   application of 349 and 350.

3            But even if it were, we believe that the

4   circumstances under which the plaintiff is positing

5   this is not a circumstance that can be described as

6   anything other than idiosyncratic because we're talking

7   about a consumer who is not going to replace the

8   cartridges?  So you're going to buy a machine for $200

9   let's say, you're going to let it cycle through one

10  cartridge, and then you're going to give up on the

11  machine after it runs out of ink and use it only as a

12  scanner?  If that was your intent, why not just buy a

13  cheap scanner?

14           THE COURT:  Let me follow up on that, right?

15  Isn't it fair to say that there might be instances

16  where a consumer runs out of ink and figures, as I

17  suggested earlier, that they're going to use the

18  scanner until they can get to the store and get the

19  ink.  The fact that they had to go through that

20  additional expense, lack of use, and so forth, isn't

21  that some -- doesn't that raise some question as to --

22           MR. SILBERBERG:  Your Honor, I think that's

23  a fair point.  I think that's a fair question.

24           THE COURT:  Okay.

25           MR. SILBERBERG:  And I would respond to it

1   in two ways.  One is, there are multiple ways that you

2   can find out how to scan without ink, and we can

3   address those in our papers.  The other point is this:

4   Is that the foundation of a class action?  Let's just

5   think about that for a minute.  If there are occasional

6   instances in which a consumer is not going to go to the

7   store and buy a replacement cartridge and instead is

8   going to let it lie fallow and just use it as a scanner

9   or just use it kind of on a one-time-only basis, to

10  scan something until he has to go to the store that

11  evening to buy the cartridge, is that the foundation of

12  a class action?  I mean, looking ahead -- looking

13  ahead --

14         THE COURT:  Counsel, let me hand your

15  question back to you like this:  Does it matter, and it

16  might not matter and it's certainly not developed in

17  the factual record, as to why this particular set of

18  features was -- I'm not going to call it features --

19  circumstances was included in the machine?  In other

20  words, was there a need to scan -- to shut off the

21  scanner or make one scan differently in the absence of

22  ink, or does the fact that it was included -- if it

23  wasn't a mechanically or materially necessary factor,

24  does that raise a question of whether or not it's a

25  deceptive consumer-oriented practice?

1          MR. SILBERBERG:  Well, let me answer that

2    question this way because I don't know how far outside

3    the pleadings we want to get.  But the fact of the

4    matter is that there was an engineering reason to do it

5    this way.

6          THE COURT:  Okay.  That's highly probative -

7    - that's highly significant I think in the resolution

8    of the thing.  I just don't think we're there yet,

9    right?  That's the problem.  That also begs some

10   questions for me about what should happen next.  But

11   you can see a circumstance where, if it were built

12   intentionally into the machine for no good reason,

13   right -- essentially, I have my all-in-one printer

14   telling me, you're out of ink so you can't scan.  Well,

15   if that's not true and it was sort of crafted that way,

16   then I'm being deceived, yeah?

17         MR. SILBERBERG:  Well, I think it goes back

18   -- I appreciate the questions, I appreciate the

19   discussion very much.  It's very stimulating, very

20   provocative.  I still think it goes back to the

21   question of whether this is materially misleading.  And

22   when you go into the case law as to what that means, I

23   don't think that this is on the side of the line where

24   it can survive a motion to dismiss.  Of course, that's

25   your judgment to make but I do think, your Honor -- I

1   do think it's worth of exploring what would come next

2   because --

3          THE COURT:  We'll get there but before we

4   discuss what comes next, I need to get to something

5   first, which is the unjust enrichment claim.  You're

6   saying it's primarily -- and I regularly dismiss unjust

7   enrichment claims for this reason, that it's a

8   duplicative of another claim.  What claim is it

9   duplicative of?

10          MR. SILBERBERG:  I think it's duplicative of

11  both claims.  It's duplicative of both the express

12  warranty claim and it's also duplicative of the 349 and

13  350 claims.  And as your Honor I think would probably

14  recognize, there are an abundance of decisions that

15  have recognized that an unjust enrichment claim is just

16  a tagalong claim.

17          THE COURT:  Okay.

18          MR. SILBERBERG:  That you would not -- it

19  would be extremely unusual, and I'm frankly not aware

20  of any, where you would have one of these putative

21  class action cases where an unjust enrichment claim

22  would be the surviving claim.

23          THE COURT:  I hear you.

24          MR. SILBERBERG:  In other words, the other

25  claims would have been dismissed and it would have been

1   deemed to be survivable on the basis of unjust

2   enrichment.  I'm not aware of a single case where

3   that's happened.

4            THE COURT:  Counsel, I've got to tell you --

5   this is just an interesting background fact.  The

6   frequency with which unjust enrichment claims are

7   dismissed under New York law because it's a breach of

8   contract claim or whatever else it is, is one of the

9   inspirations for doing the pre-motion conference in the

10  way that I do because invariably, when we get to this

11  claim, someone is always like yeah, if this other thing

12  goes forward, then this one can't, right?  So it's easy

13  and saves us some paper and some time, so that's one of

14  my inspirations for doing this.

15           But let me go to your adversary for one

16  moment with this question:  Assuming for the purposes

17  of argument only because we haven't gotten there yet,

18  your GBL claim or claims survive, do you agree that the

19  unjust enrichment claim drops out at that point?

20           MS. MACCARONE:  Yeah, your Honor, we

21  recognize that there is a split in the circuit on this

22  issue.  And without knowing which of our claims

23  survive, it's hard to concede that this claim is not

24  necessary.  But to answer your question, if one of our

25  -- if our GBL claim does survive, then yes, we

1  recognize that the case law would support dismissal of

2  the claim.

3        THE COURT:  Okay, all right, counsel.

4  You've done fine work today.  I'm ready to render a

5  partial -- well, I'm really to decide actually on the

6  motions to dismiss.  I'm going to proceed.

7        So as set forth in Rule 2(e)(1) of my

8  individual rules, a practice recently affirmed by the

9  Second Circuit again, the Court reserves the discretion

10  to construe the pre-motion letters along with counsels'

11  argument as the motion itself.  It's particularly easy

12  to do in a case like this, where counsel has done a

13  fine job of briefing and arguing the motion, and I

14  thank you for that.  As noted in that rule, this

15  procedure has been upheld by the Second Circuit and I

16  actually have the cite here.  It's <u>Brown v. The People</u>

17  <u>of the State of New York</u>, 21-CV-1408, which was decided

18  January 26th, 2022 by the Second Circuit.  Just showing

19  you I'm cutting edge and the Court has the discretion,

20  all right?  The exercise of discretion is rendered more

21  probative by a couple of factors, including the

22  existence of the original rule, the fact that I put you

23  on notice of it, but also because of the pandemic,

24  we're trying to keep things moving and it's still a

25  little bit hard, so I'm hoping we'll meet together

1   soon.

2          All that said, this motion is decided -- the

3   motions to dismiss.  I'm going to deem the defendant's

4   motions to dismiss made.  It's cited under the well-

5   established standard review for such matters as

6   discussed in countless cases, but I'll cite one, Boris

7   v. Nassau County District Attorney, 2017 W.L. 9485714,

8   which I'll incorporate by reference.  But we all know

9   what it says, which is that a court is required to

10  decide assuming the allegations to be true for the

11  purposes of the motion whether there are sufficient

12  facts to determine whether the claim is plausible on

13  its face.  And when I say that, I need to emphasize

14  that there is a portion of that rule that says

15  inferences must be drawn in favor of the non-movant,

16  which I think becomes very important here.

17         Based on my review of the complaint and,

18  again, counsels' fine argument of the motion, I find

19  that the complaint does in part state plausible claims

20  and does not in other parts.  Let me start with the

21  express warranty claim.

22         Here, I'm going to say that that claim is

23  not plausible because at least at this juncture, with

24  what we have before us -- and counsel did a nice job on

25  pulling up certain cases.  I'll note the Marshal v.

1   <u>Hundai Motor</u> case, 334 FRD 36 at 51, which states that

2   to allege a claim for breach of express warranty in New

3   York, the claim must show that the express warranty

4   existed, was breached, and that the claimant had relief

5   on that warranty.  I think if you look at the specifics

6   of this case, there is no express warranty term that

7   says the scanner will work when there's no ink or the

8   scanner will not work unless you do certain things when

9   there is no ink.  I just don't think that the express

10  warranty is specific enough to cover this circumstance.

11  So under those principles, I'm going to dismiss the

12  express warranty claim.

13          The GBL claims are a much different

14  scenario.  As we all know, GBL 349 and 350 are broadly

15  addressed to a variety of claims that relate to things

16  of importance to consumers, including any sort of

17  deceptive practice on consumers.  I've done a lot of

18  writing on 349 and 350 and I'm going to say that those

19  statutes as construed are broad enough to cover these

20  circumstances, and I believe that the GBL claims should

21  go forward.

22          Counsel cites the interesting <u>Hewlett</u>

23  <u>Packard</u> case from the Second Department and I have

24  considered that, but I don't think that the

25  substitution of the smaller ink cartridge for the large

1 ink cartridge has exactly the same potential in these

2 circumstances here.  I'm only drawing inferences and,

3 again, I have to draw the inferences in the favor of

4 the plaintiff here, who is defending against the

5 motion.

6           I will say that, as I noted early on, that

7 in a circumstance in which the ink runs out, it might

8 be more vital -- I don't know but it could be --

9 there's a reasonable inference that it could be more

10 vital to a consumer that the scanner works at that

11 moment so they can take some other action with the

12 printer because they can't get it to print out of the

13 machine, so they scan it and do something else, email

14 it or send it someone else who can print it or

15 whatever.  Any of those things could be and of course,

16 this is very preliminary and I'm not making any

17 rulings.

18           I suspect and certainly am expressly holding

19 that this will be revisited at the summary judgment

20 stage, and I'm going to talk to you about that in a

21 moment as to where we go next.  Anyway, I find that the

22 GBL claims survive and as a result of that, as

23 discussed with counsel, the GBL claims will go forward,

24 the unjust enrichment claims drop out as duplicative.

25 And there are a bazillion cases that say that so I'm

1    not going to bother cluttering the record.

2              So that's my ruling on the motions to

3    dismiss.  I often get the question, is there a written

4    decision that will follow?  No.  You can order a

5    transcript of this and that is the decision of the

6    Court.  We'll issue a short, written order today

7    saying, see transcript for details, but if you want the

8    decision, you can order the transcript.

9              That brings us to the question of what goes

10   next?  Now, the first thing I want to say is, counsel

11   raised the specter of discovery here.  I recognize that

12   class-wide discovery is broad and very painful and very

13   expensive for both sides, and it's a big risk.  You're

14   very fortunate in that you have Judge Shields on this

15   case.  She is terrific and I generally leave it

16   entirely to the magistrates to regulate discovery.

17   However, I'd like to talk to counsel since we're on it.

18             Do you foresee sort of coming up with stages

19   of discovery, phases where perhaps we look at issues

20   like the more narrow -- why the machines operate the

21   way they do, what are the mechanical aspects, if you

22   hold the button, does it scan or whatever, before going

23   into class-wide discovery.  Does that make sense?  Is

24   that a good way to sort of phase this through?

25             MR. SILBERBERG:  This is Rich Silberberg,

1    Judge.  I certainly do think that the issue of whether

2    it scans without ink should be prioritized in terms of

3    discovery because that is the central focus of this

4    case.  In other words, the complaint alleges that you

5    cannot scan without ink.  I think you heard counsel a

6    few minutes ago say that her client tried to do this

7    and can't.

8                  THE COURT:  Yeah.

9                  MR. SILBERBERG:  And I think we are, as I

10   said, 100% certain that that allegation is wrong, and I

11   think it would be helpful that we find a way, perhaps

12   with Judge Shields' assistance, that we could focus on

13   that issue because if we want to narrow the case down,

14   it would certainly be good to have that issue dealt

15   with, and then we could talk about whether the manner

16   in which one can scan without ink is problematic.  But

17   it seems to me that there are those two broad issues

18   that are presented in the case, and the first one is

19   going to be pretty easy I think to discern.

20                  THE COURT:  Yeah.  Let me say something sort

21   of as a preemptive strike here because I know where

22   counsel is going to go next on this, which is -- I

23   worked in the computer industry, actually in the legal

24   department of another -- of a software company for a

25   number of years.  I think we used to call this a

1  workaround, right?  So the fact that the defendant has

2  what I'll call a workaround for the scanner not working

3  without the ink may or may not preclude liability.  I

4  don't know.  I mean, there may still be liability

5  notwithstanding that fact but it just might be

6  different.  It would make sense to me that identify

7  whether that's the issue or the issue is, it just

8  doesn't work at all.

9           Let me go to plaintiff's counsel with that.

10          MS. MACCARONE:  I agree with that statement,

11 your Honor.  Even if discovery shows that there are

12 workarounds, there is perhaps a temporary fix in this

13 case, that's not the -- that's not the entire issue.

14 We are open to discussing reasonably focused discovery

15 with defendants.  We can have those conversations

16 online and refer back to you if that's okay with you.

17          THE COURT:  Look, when I posited the

18 possible existence of an engineer or sales person's

19 memo that says, I've got a great idea, let's shut off

20 the scanner when there's no more ink, I know that sent

21 you into like a dream world of excitement.  So I would

22 suggest that you satisfy yourself that that doesn't

23 exist, things like that don't exist, and that (ui)

24 explanation of why it works the way it does, I think,

25 yeah.

1          MS. MACCARONE:  Right, exactly.  It would be

2   -- that's certainly information that we would want to

3   gather through discovery.

4          MR. SILBERBERG:  I mean, I have to say that

5   I don't want to dampen anybody's expectations but as I

6   said, this was developed in 2004 and we're in 2022.

7   So, you know, I can't imagine what exists and doesn't

8   exist.  I'm not going to speculate but I don't want to

9   elevate anybody's expectations as to what might exist

10  from 2004.

11         THE COURT:  People can have dreams, right?

12  That's the thing.

13         MR. SILBERBERG:  Yes, of course, of course.

14         THE COURT:  When I said it, she thought up,

15  I imagine, the Power Point to the board, the financial

16  projections, right, of how much this will generate?

17  That would be the greatest thing that ever happened.

18  But it's not that, it's going to be something

19  different.  And whatever we're guessing, it's a third

20  thing, but you know I'm always the last know.

21         What I'll say is this:  I don't want to

22  constrain Judge Shields in any way but she is a

23  terrific person to work with.  What I would say to you

24  is, you both seem very reasonable and very smart and

25  you know what's at issue here.  Nobody wants to do

1   class-wide discovery if this is going to be a dry well

2   at the end of the day.  It's just going to cost

3   everybody a lot of money.  So what I would say is, if

4   you two can work together to kind of come up with a

5   proposal, meet and confer first before you even see

6   her, I'm sure that will go very well.  Again, (ui) I

7   think it's a good idea if you can structure discovery

8   in a way that becomes reasonable.  I certainly would be

9   happy to allow you more time to do that so that we

10  don't have to waste time and energy on things we don't

11  need to chase down, so that helps, yeah?

12          MR. SILBERBERG:  Understood, your Honor.

13          MS. MACCARONE:  Understood, thank you, your

14  Honor.

15          MR. SILBERBERG:  Your Honor, may I --

16          THE COURT:  Anything else?

17          MR. SILBERBERG:  May I use this opportunity

18  to make an oral application for an extension of time to

19  file our answer to the complaint because I believe --

20  I'm trying to remember what the time frame is.

21          THE COURT:  It's some number of days but

22  what do you want?

23          MR. SILBERBERG:  I'll just ask plaintiff's

24  counsel, can we have thirty days to respond?

25          MS. MACCARONE:  Yes.

1              THE COURT:  What do you say, counsel?

2              MS. MACCARONE:  That's fine.

3              THE COURT:  Okay, that's great.

4              MR. SILBERBERG:  Thank you.

5              THE COURT:  I would have given you 32 days

6    if you'd ask but 30 is good, too.  Make it 4:30 p.m.,

7    you know?  Okay, good.  Anything else we should do

8    while we're on the phone today?

9              MR. SILBERBERG:  I think that's it, your

10   Honor.  I guess I would ask the following question:

11   Does your Honor intend to schedule a Rule 16 conference

12   or would your Honor prefer that we try to work

13   something out and give us some time to see if we can

14   present something to Magistrate Judge Shields?

15             THE COURT:  I won't do that at all.  That

16   will be entirely up to Judge Shields.  But I would say

17   if you all want some time to work on that and get -- I

18   don't know what her rules are on this.  Take a look.

19   But if you get in touch with her, she's very flexible.

20   I think if you say to her, Judge, we're working on this

21   and we're going to try to work it out, work out some of

22   these discovery issues but we'd like X number of days

23   or whatever, I don't think she will have a problem with

24   that, all right.

25             MR. SILBERBERG:  Very good.  Thank you, your

1   Honor.

2            THE COURT:  Stay well.  It's good talking to

3   you.

4            MS. MACCARONE:  Thank you, your Honor.

5            MR. SILBERBERG:  Thank you.

6                     *  *  *  *  *  *  *

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18      I certify that the foregoing is a correct

19  transcript from the electronic sound recording of the

20  proceedings in the above-entitled matter.

21

22

23

24

25  ELIZABETH BARRON                    March 7, 2022